IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:08-CV-88-BR

KATHLEEN ANSLEY and JERRY ANSLEY, )
)
          Plaintiffs, )
  v. ) ORDER
)
HEALTHMARKETS, INC., MID-WEST )
NATIONAL LIFE INSURANCE COMPANY )
OF TENNESSEE, THE ALLIANCE FOR )
AFFORDABLE SERVICES, INC., )
SPECIALIZED ASSOCIATION SERVICES, )
LTD., and TERRY DAVID HAMILTON, )
)
          Defendants. )

This matter is before the court on the renewed motion to remand (DE # 179) filed by plaintiffs Kathleen Ansley and Jerry Ansley (collectively "plaintiffs") and on the motions to dismiss (DE ## 93, 103, 171, 187, 194) filed by defendants HealthMarkets, Inc. ("HealthMarkets"), Mid-West National Life Insurance Company of Tennessee ("Mid-West"), The Alliance for Affordable Services, Inc. ("Alliance"), Specialized Association Services, Ltd. ("SAS") and Terry David Hamilton ("Hamilton") (collectively "defendants"). The motions have been fully briefed and are ripe for disposition.

## I. BACKGROUND

In this action, plaintiffs seek damages from defendants relating to the sale of a health insurance policy. Plaintiffs and Hamilton are residents of North Carolina.[1] (Am. Compl., DE # 2-2, ¶¶ 1-2, 7.) Plaintiffs allege that Kathleen Ansley met with Hamilton at plaintiffs' home on

---

[1] Mid–West, Alliance, SAS, and HealthMarkets were all incorporated outside of North Carolina and have their principal places of business outside of North Carolina. (Am. Compl., DE # 2-2, ¶¶ 3-6.)

13 September 2001. (Id. ¶ 37.) Hamilton was allegedly acting as both an insurance agent for Mid–West and a field representative for Alliance.[2] (Id. ¶ 7.) Hamilton "began the discussion by going to the issue of health insurance, specifically asking what Kathleen Ansley was looking for in health insurance." (Id. ¶ 37a.) Ansley explained to Hamilton that she and her husband "rarely if ever used a doctor" (Id. ¶ 37c), and that, as a result, they were "concerned about protecting themselves against the possibility that something catastrophic might happen – a stroke, a motor vehicle accident caused by an uninsured or underinsured driver, etc. – that could result in significant medical bills." (Id. ¶ 37d.) Kathleen Ansley told Hamilton "that her main purpose was to protect her and Jerry Ansley's retirement assets, including a recent inheritance." (Id. ¶ 37b.) She "spent the greatest amount of time explaining that after making thirty years of mortgage payments on houses, the Ansleys finally owned their home outright, and that to her, it was of the utmost importance to have catastrophic health insurance in order to protect the equity in their home and their assets." (Id. ¶ 37e.) The amended complaint further alleges that "[a]ll of Kathleen Ansley's discussions with Defendant Hamilton focused on protecting the Ansleys' assets from the costs of a catastrophic illness or injury." (Id. ¶ 37g.)

In response to these concerns, plaintiffs allege that Hamilton stated that Kathleen Ansley "was 'exactly the type of person' for which health insurance was provided through Defendant Alliance, that this health insurance would be right for someone like her who did not have any health issues, who did not see a doctor often, but who wanted peace of mind if the 'unthinkable happened,' in which case the insurance would 'protect her assets.'" (Id. ¶ 38i.) Hamilton also allegedly assured Kathleen Ansley "that she was being given the opportunity to purchase health

---

[2] HealthMarkets is alleged to be the alter ego of Mid–West. (Am. Compl., DE # 2-2, ¶ 9.) SAS is alleged to be the alter ego of Alliance. (Id. ¶ 12.)

insurance that would pay up to $1,000,000 in insurance benefits over the course of the insured's lifetime, and up to $500,000 in benefits for a single illness." (Id. ¶ 38k.)

During the meeting with Hamilton, Kathleen Ansley agreed to purchase the health insurance endorsed by Alliance, and she wrote a check out to Mid-West to cover her membership fees and her initial premium for health insurance. (Id. ¶ 42.) On or about 15 September 2001, Hamilton telephoned Ansley to inform her that her application had been accepted. (Id. ¶ 43.) Shortly thereafter, Kathleen Ansley received a copy of the Mid-West insurance policy in the mail, and she reviewed the policy before putting it away. (Id. ¶ 44.)

In 2003, Jerry Ansley was added as an insured to the policy. (Id. ¶ 47.) In the fall of 2004, he became ill and was hospitalized on several occasions. (Id. ¶¶ 49-53.) He eventually accumulated over $1 million in medical bills. (Id. ¶ 53.) After Mid–West paid only a small fraction of Jerry Ansley's medical bills (Id. ¶ 56), plaintiffs commenced this action in North Carolina state court on 14 January 2008. Plaintiffs' amended complaint asserts claims for common law fraud and violations of North Carolina's Unfair and Deceptive Trade Practices Act ("UDTPA"), N.C. Gen. Stat. § 75-1.1 *et seq*.

On 4 March 2008, Mid–West removed plaintiffs' lawsuit to this district. (Notice of Removal, DE # 2.) Although Hamilton and plaintiffs are residents of North Carolina, Mid–West invoked this court's diversity jurisdiction on the ground that Hamilton is not a proper party to this action. On 3 April 2008, plaintiffs moved to remand for lack of subject matter jurisdiction. (DE # 26.) In April and May 2008, all of the defendants filed motions to dismiss plaintiffs' amended complaint. (DE ## 30, 34, 36, 40, 55.)

Following the issuance of a Conditional Transfer Order, the Judicial Panel on

3

Multidistrict Litigation ("MDL") transferred this action to the Northern District of Texas on 12 August 2008. (DE # 76.) The MDL determined that plaintiffs' lawsuit involved common questions of fact with certain actions that had been previously transferred to the Northern District of Texas for consolidated proceedings in In re UICI "Association Group" Insurance Litigation, MDL 1578, 305 F. Supp. 2d 1360 (J.P.M.L. 2004). The actions shared allegations "that the defendants engaged in a scheme to sell so-called association-group insurance by, *inter alia*, fraudulently concealing relationships between certain insurance companies and two purported not-for-profit associations and making fraudulent misrepresentations in connection with the marketing of memberships in the associations." (MDL 8/12/08 Transfer Order, DE # 76, at 1.)

Almost three years later, on 9 June 2011, the Northern District of Texas entered an order suggesting remand to this court. (DE # 165.) The MDL issued a finalized order for the return of the case to this district on 24 June 2011. (DE # 167.) Plaintiffs filed a renewed motion to remand on 21 July 2011. (DE # 179.) According to plaintiffs, Hamilton is a properly named, non-diverse party whose presence in the litigation defeats federal diversity jurisdiction. As part of the motion to remand, plaintiffs have requested an award of costs and expenses, including attorney fees, pursuant to 28 U.S.C. § 1447(c). (Id.) After plaintiffs' case was returned to this district, all of the defendants renewed their motions to dismiss plaintiffs' amended complaint. (DE ## 93, 103, 171, 187, 194.)

## II. DISCUSSION

A. Fraudulent Joinder Standard

Defendants removed this action to federal court solely on the basis of diversity

4

jurisdiction.  (Notice of Removal, DE # 2.)  Federal district courts have original jurisdiction over actions between citizens of different states in which the matter in controversy exceeds $75,000, exclusive of interest and costs.  28 U.S.C. § 1332(a).  If any defendant resides in the same state as any plaintiff, there is no complete diversity and no federal jurisdiction.  Mayes v. Rapoport, 198 F.3d 457, 461 (4th Cir. 1999).  This complete diversity rule "makes it difficult for a defendant to remove a case if a nondiverse defendant has been party to the suit prior to removal." Id. (footnote omitted).  Here, defendants do not dispute that plaintiffs and Hamilton are all residents of North Carolina.

The doctrine of fraudulent joinder, however, "permits removal when a non-diverse party is (or has been) a defendant in the case."  Id.  In essence, the fraudulent joinder doctrine allows a court "to disregard, for jurisdictional purposes, the citizenship of certain nondiverse defendants, assume jurisdiction over a case, dismiss the nondiverse defendants, and thereby retain jurisdiction."  Id.

A defendant seeking removal of a state court action to federal court bears the heavy burden of establishing that a non-diverse defendant has been fraudulently joined.  See id. at 464. In order to establish the existence of fraudulent joinder,

> the removing party must establish either: that there is no possibility that the
> plaintiff would be able to establish a cause of action against the in-state defendant
> in state court; or that there has been outright fraud in the plaintiff's pleading of
> jurisdictional facts.

Id. (emphasis in original) (citation and alterations omitted).  In applying this strict standard, "[a] claim need not ultimately succeed to defeat removal; only a possibility of a right to relief need be asserted."  Marshall v. Manville Sales Corp., 6 F.3d 229, 233 (4th Cir. 1993).  Furthermore, the Fourth Circuit Court of Appeals has emphasized that the standard for evaluating a fraudulent

5

joinder issue "is even more favorable to the plaintiff than the standard for ruling on a motion to dismiss under Fed. R. Civ. P. 12(b)(6)." Hartley v. CSX Transp., Inc., 187 F.3d 422, 424 (4th Cir. 1999). Courts should "resolve all doubts about the propriety of removal in favor of retained state court jurisdiction." Id. at 425 (citation and internal quotation marks omitted).

In evaluating a claim of fraudulent joinder, all legal and factual issues must be resolved in favor of the plaintiff. Mayes, 198 F.3d at 464. A court making a determination on the issue of fraudulent joinder "is not bound by the allegations of the pleadings, but may instead consider the entire record, and determine the basis of joinder by any means available." Id. (citation and internal quotation marks omitted).

In this case, none of the defendants[3] allege that there has been outright fraud in the plaintiffs' pleading of jurisdictional facts. Thus, the only question at issue is whether plaintiffs have any possibility of recovering damages from Hamilton, the non-diverse defendant, in state court. If so, then the case must be remanded to state court for lack of diversity jurisdiction.

B.  Potential Viability of Plaintiffs' Claims

Defendants make three basic arguments as to why plaintiffs' claims against Hamilton are not viable. First, they contend that plaintiffs' claims are barred by the relevant statutes of limitations. Second, they argue that plaintiffs fail to allege actionable substantive claims against Hamilton. Third, they maintain that plaintiffs' claims are barred by res judicata.

---

[3] Both Alliance and Mid-West filed substantive responses to plaintiffs' renewed motion to remand (see DE ## 189, 190), while HealthMarkets, SAS, and Hamilton responded by joining the responses filed by Alliance and/or Mid-West (see DE ## 191, 192, 193).

1. Statutes of limitations

Defendants contend that plaintiffs have no possibility of recovering damages from Hamilton in state court because their claims are time-barred. The parties agree that under North Carolina law, plaintiffs' fraud claim is subject to a three-year statute of limitations, while their UDTPA claim is subject to a four-year statute of limitations. See N.C. Gen. Stat. §§ 1-52(9), 75-16.2. With respect to both claims, the relevant time period begins to run when the fraud either is actually discovered or should have been discovered with the exercise of reasonable diligence. See N.C. Gen. Stat. § 1-52(9); White v. Consol. Planning, Inc., 603 S.E.2d 147, 163 (N.C. Ct. App. 2004), disc. review denied, 610 S.E.2d 717 (N.C. 2005); Hunter v. Guardian Life Ins. Co. of Am., 593 S.E.2d 595, 601 (N.C. Ct. App.), disc. review denied, 599 S.E.2d 48, 49 (N.C. 2004); Nash v. Motorola Commc'ns & Elecs., Inc., 385 S.E.2d 537, 538 (N.C. Ct. App. 1989), aff'd, 400 S.E.2d 36 (N.C. 1991).

Here, plaintiffs commenced their action against defendants in state court on 14 January 2008.[4] Plaintiffs contend that their lawsuit was filed within both applicable limitations periods because their fraud and UDTPA claims did not accrue until sometime on or after 14 January 2005, when they actually discovered that Jerry Ansley's medical bills were not being paid by Mid-West. (Am. Compl., DE # 2-2, ¶¶ 55, 57.) In contrast, defendants argue that the claims are time-barred because plaintiffs were or should have been on notice of those claims at a much

---

[4] Defendants argue that this lawsuit was actually commenced on 4 February 2008, which is the date that plaintiffs filed their initial complaint in state court. (See Compl., DE # 2-3.) However, plaintiffs contend that their action was commenced on 14 January 2008, when they filed an application and obtained an order (see DE # 2-4 at 23) granting them permission to file a complaint for fraud against the defendants within twenty days of the date of the issuance of the order pursuant to Rule 3 of the North Carolina Rules of Civil Procedure. See Stinchcomb v. Presbyterian Med. Care Corp., 710 S.E.2d 320, 324 (N.C. Ct. App.), disc. review denied, No. 222P11, 2011 WL 3820984 (N.C. Aug. 25, 2011). For the purpose of ruling on the motion to remand, the court finds that plaintiffs' action was commenced on 14 January 2008. See Mayes, 198 F.3d at 464 (In evaluating a claim of fraudulent joinder, all issues of fact and law must be resolved in favor of the plaintiff.).

7

earlier time. Specifically, defendants insist that plaintiffs should have discovered their alleged claims upon receipt of the insurance policy in September 2001 because the terms of the policy are "clear and unambiguous." (Mid-West's Resp. Pls.' Renewed Mot. Remand, DE # 190, at 16-17.)

"Ordinarily, the question of when fraud, in the exercise of reasonable diligence, should be discovered is a question of fact for the jury." White, 603 S.E.2d at 163. However, when "the evidence is clear and shows without conflict that the claimant had both the capacity and opportunity to discover the fraud but failed to do so, the absence of reasonable diligence is established as a matter of law." Id. (citation and internal quotation marks omitted).

Defendants are asking the court to find that the absence of reasonable diligence on the part of the plaintiffs has been established as a matter of law. They argue that under North Carolina law, "[p]ersons entering contracts of insurance, like other contracts, have a duty to read them and ordinarily are charged with knowledge of their contents." Baggett v. Summerlin Ins. & Realty, Inc., 545 S.E.2d 462, 468 (N.C. Ct. App.) (citation omitted), rev'd per curiam, 554 S.E.2d 336 (N.C. 2001) (adopting dissent). They also stress repeatedly that Kathleen Ansley "reviewed the policy" after she received it in September 2001. (Am. Compl., DE # 2-2, ¶ 44; see also Alliance's Mem. Opp'n Pls.' Renewed Mot. Remand, DE # 189, at 10; Mid-West's Resp. Pls.' Renewed Mot. Remand, DE # 190, at 18, 19, 21 n.11.) As a result, defendants maintain that Kathleen Ansley had "full opportunity to learn of the contents and coverage provided therein," and that any claim against defendants should have been discovered, as a matter of law, in September 2001. (Mid-West's Resp. Pls.' Renewed Mot. Remand, DE # 190, at 16 (citing Gordon v. Fidelity & Cas. Co. of N.Y., 120 S.E.2d 509 (S.C. 1961)).)

8

The court is unwilling to make the finding requested by defendants. While a trier of fact may ultimately determine that the clock started running on plaintiffs' claims when Kathleen Ansley reviewed the policy in September 2001, given the posture of the case and the strictures of the fraudulent joinder doctrine, a contrary result, *i.e.*, a finding that the claims did not accrue until some time on or after 14 January 2005, would not be impossible.

Although defendants insist that the insurance policy at issue is clear and unambiguous, a reasonable trier of fact could find that the policy appears to have been purposefully written in order to disguise and obfuscate the limitations on payment. For example, the policy promises to pay <u>100% of covered expenses</u>, with a 90-day limit, for stays in a hospital intensive care unit. (<u>See</u> Ins. Policy, DE # 2-8, at 3A (emphasis added).) However, the maximum policy benefit for such a stay is only $600 per day. (<u>Id.</u>) Furthermore, there is no information contained in the policy from which to evaluate the real world cost of medical procedures. (<u>See</u> <u>generally</u> <u>id.</u>) As a result, a trier of fact could find that, absent additional information regarding the costs of modern medical care, Kathleen Ansley would have had no reason to suspect upon her initial review of the insurance policy in 2001 that the terms of the policy were inconsistent with the catastrophic health coverage described by Hamilton[5] (<u>see</u>, <u>e.g.</u>, Am. Compl., DE # 2-2, ¶ 38i). This determination, in turn, would support the conclusion that plaintiffs did not discover the alleged fraud until they actually discovered that Jerry Ansley's medical bills were not being paid by Mid-West, which occurred no earlier than 14 January 2005. (<u>See</u> Am. Compl., DE # 2-2, ¶¶

---

[5] This finding is supported by the amended complaint, which indicates that Kathleen Ansley possessed little knowledge about the costs of modern medical care. The amended complaint states that Kathleen Ansley "had enjoyed . . . robust health and had rarely if ever had occasion to use health insurance" (Am. Compl., DE # 2-2, ¶ 33); had not seen a doctor in over a decade (<u>id.</u> ¶ 37c); and "had only seen a doctor for a single-occurrence, minor condition or for the births of her children" (<u>id.</u> ¶ 37f).

9

55, 57.) As a result, defendants have failed to show that plaintiffs' claims against Hamilton are clearly barred by the applicable statutes of limitations.[6]

    2. Substantive claims

Defendants also contend that plaintiffs have not brought plausible fraud or UDTPA claims against Hamilton because Kathleen Ansley has essentially admitted in her deposition testimony that she has no fraud claim against him.[7] (Alliance's Mem. Opp'n Pls.' Renewed Mot. Remand, DE # 189, at 12-13; Mid-West's Resp. Pls.' Renewed Mot. Remand, DE # 190, at 21.)

The court first notes that it may not "delv[e] too far into the merits in deciding a jurisdictional question." Hartley, 187 F.3d at 425. The Fourth Circuit Court of Appeals has explained:

> Jurisdictional rules direct judicial traffic. They function to steer litigation to the proper forum with a minimum of preliminary fuss. The best way to advance this objective is to accept the parties joined on the face of the complaint unless joinder is clearly improper. To permit extensive litigation of the merits of a case while determining jurisdiction thwarts the purpose of jurisdictional rules.

Id. Again, the standard for evaluating a fraudulent joinder issue "is even more favorable to the plaintiff than the standard for ruling on a motion to dismiss under Fed. R. Civ. P. 12(b)(6)." Id. at 424.

Without delving too far into the merits of plaintiffs' claims, the court notes that the

---

[6] In raising these issues, the court expresses no opinion on how the trier of fact should view the evidence in this case or what findings the trier of fact should make. The court merely points out that it would not be impossible for the trier of fact to conclude that the claims in this case did not accrue until plaintiffs actually discovered that Jerry Ansley's medical bills were not being paid by Mid-West.

[7] This argument also impacts plaintiffs' UDTPA claim because the amended complaint indicates that the UDTPA claim is based on fraud. (See, e.g., Am. Compl., DE # 2-2, ¶¶ 72-74, 76.)

10

deposition testimony on which defendants rely relates solely to Kathleen Ansley's understanding of the scope of the insurance policy, *i.e.*, the range or extent of coverage. (See, e.g., Dep. Test. Kathleen Ansley, DE # 190-3, Ex. 1, at 90:19 (testifying that the policy limits were "printed clearly" in the benefits brochure); id. at 91:6 (testifying that she understood the benefits and limitations on coverage "as they're written").) However, plaintiffs allege that at least one, if not more, of Hamilton's misrepresentations and omissions related to the nature of the policy, *i.e.*, the essential character or distinguishing qualities of the coverage. For example, prior to purchasing the insurance, Kathleen Ansley explained to Hamilton that she was seeking to protect the Ansleys' assets from the costs of a catastrophic illness or injury (see, e.g., Am. Compl., DE # 2-2, ¶¶ 37b-g), and when Hamilton made the statement that the insurance would "'protect her assets'" if "the 'unthinkable happened'" (Id. ¶ 38i), he represented that the policy would meet her stated needs. This alleged misrepresentation to Kathleen Ansley that the Mid-West insurance policy would provide catastrophic health insurance coverage was a representation as to the nature of the coverage and not to its scope. Because Kathleen Ansley's deposition testimony relates only to the scope of the insurance policy, the court is unwilling to find that this testimony precludes her from claiming that Hamilton misrepresented the nature of the insurance policy. Thus, the court cannot declare that plaintiffs have no possibility of succeeding against Hamilton, and defendants' argument on this issue is without merit.[8]

---

[8] With regard to the viability of plaintiffs' substantive claims, Mid-West also maintains that plaintiffs could not have justifiably relied on any misrepresentations made by Hamilton because Kathleen Ansley could have discovered the truth regarding the limitations of the insurance policy when she received the policy in 2001. This argument is similar to the one that the court has already rejected with respect to the statutes of limitations issue, and it is rejected here for the same reasons. See discussion, supra, at 7-10.

11

3. Res judicata

Finally, defendants assert that certain aspects of plaintiffs' claims relating to the "Association Method" of marketing and selling insurance are barred by res judicata. This argument relates to a national class action settlement that was reached in two of the related cases that were transferred to the Northern District of Texas for consolidated proceedings in In re UICI "Association Group" Insurance Litigation, MDL 1578. Specifically, the settlement was entered in the cases of Lacy v. MEGA Life & Health Insurance Co., *et al*., United States District Court for the Northern District of California, Oakland Division, Civil Case No. C03-02852 CW, and Golebiowski v. MEGA Life & Health Insurance Co., *et al*., United States District Court for the Northern District of Mississippi, Eastern Division, Civil Action No. 1:03CV620 D-D. (See Stipulation of Settlement & Release, DE # 2-11, at 1.)

The court does not find it necessary to devote much time to this argument because defendants clearly admit that res judicata does not bar plaintiffs' claims in their entirety. (See Mid-West's Resp. Pls.' Renewed Mot. Remand, DE # 190, at 22; Alliance's Mem. Opp'n Pls.' Renewed Mot. Remand, DE # 189 at 14.) Furthermore, the definition of released claims in the class action settlement excludes any specific claims by an individual based on "representations regarding the nature or scope of health insurance coverage and any damages arising therefrom . . . ." (Stipulation of Settlement & Release, DE # 2-11, at 8, § 1.42 (emphasis added).)[9] Thus, defendants have failed to show that all of plaintiffs' claims are barred by res judicata.[10]

---

[9] The court expresses no opinion on whether any claims relating to the Association Method of marketing and selling insurance will be viable in state court.

[10] Mid-West also argues that plaintiffs cannot maintain their claims against Hamilton because "[p]laintiffs have confirmed in other filings that their alleged 'reliance' of fraud claims [are] premised on barred claims based on

(continued...)

12

Case 5:08-cv-00088-BR   Document 212   Filed 11/22/11   Page 12 of 14

Given that federal courts are courts of limited jurisdiction, the fraudulent joinder doctrine presents a high bar for defendants seeking to disregard a named party that would otherwise deprive the court of the power to hear the case. Here, defendants have not shown that there is no possibility that plaintiffs might be able to maintain their claims against Hamilton in state court. Accordingly, this case must be remanded to state court for lack of diversity jurisdiction.

C.      Request for Fees and Costs

Plaintiffs have moved for costs and expenses, including attorney fees, incurred in connection with the removal, which are recoverable within the discretion of the court. 28 U.S.C. § 1447(c); In re Lowe, 102 F.3d 731, 733 n.2 (4th Cir. 1996). Such an award is not made as a matter of course but rather where, absent unusual circumstances, "the removing party lacked an objectively reasonable basis for seeking removal." Martin v. Franklin Capital Corp., 546 U.S. 132, 141 (2005).

Here, plaintiffs have provided very little substantive argument on the issue of costs and expenses, and this alone is enough to deny the request.[11] Furthermore, although the removal has significantly delayed the resolution of this case, the court does not find defendants' arguments

---

[10](...continued)
the so-called Association Method." (Id. at 23.) In support of this position, Mid-West quotes a mere two sentences of plaintiffs' memorandum in response to the renewed motions to dismiss filed by Mid-West and HealthMarkets. (See Pls.' Mem. Resp. Renewed Mots. Dismiss, DE # 178, at 19-20.) In rejecting this argument, the court simply highlights the fact that the amended complaint contains allegations of misrepresentations and omissions on Hamilton's part which do not appear to be related in any way to the Association Method of marketing and selling insurance. (See, e.g., Am. Compl., DE # 2-2, ¶¶ 38i, 38k, 39c-g.)

[11] The motion to remand contains one brief factual paragraph relating to the "time and expense" that "plaintiffs have been forced to undergo" as a result of the removal. (Pls.' Renewed Mot. Remand, DE # 179, ¶ 7.) In their memorandum in support of the motion to remand, the only time that plaintiffs raise the issue of fees is in the conclusion section, where they state: "The plaintiffs seek a further ruling that the Removal of this action was improper and that the plaintiffs are entitled to an award of payment of just costs and any actual expenses, including attorney fees, incurred as a result of the Removal." (Mem. Supp. Pls.' Renewed Mot. Remand, DE # 180, at 16.) Plaintiffs cite no case law in support of their request, nor do they even identify the statute upon which they rely, i.e., 28 U.S.C. § 1447(c).

13

for removal to be sufficiently weak to warrant an award of costs and expenses. Although defendants' assertions of fraudulent joinder were not ultimately persuasive, they do not lack an objectively reasonable basis, particularly with respect to the statutes of limitations issue. Therefore, plaintiffs' request for costs and expenses will be denied.

### III. CONCLUSION

Plaintiffs' renewed motion to remand (DE # 179) is GRANTED. As a result, all of defendants' motions to dismiss (DE ## 93, 103, 171, 187, 194) are DENIED AS MOOT. Plaintiffs' request for costs and expenses pursuant to 28 U.S.C. § 1447(c) is DENIED. This case is REMANDED to the General Court of Justice, Superior Court Division, Wake County, North Carolina. The Clerk is directed to send a copy of this order to the Clerk of that court.

This 22 November 2011.

_____
W. Earl Britt
Senior U.S. District Judge